UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>SHAMUS HOLDINGS, LLC,<br><br>Debtor. | Chapter 11<br>Case No. 07-14572 (JNF) |

**OBJECTION OF LBM FINANCIAL, LLC TO MOTION
TO APPROVE ACQUISITION OF CLAIMS BY DEBTOR**

LBM Financial, LLC ("**LBM**"), hereby objects to the Motion to Approve Acquisition of Claims by Debtor (the "**Acquisition Motion**") filed by Shamus Holdings, LLC (the "**Debtor**") because the Debtor has failed to provide sufficient information to allow this Court to determine whether the proposed "Settlement Agreement" satisfies the standards of Fed.R.Bankr.P. 9019 and the Debtor has also failed to establish that its proposed acquisition of certain claims and its release of certain other claims are in the best interests of this bankruptcy estate. LBM also objects to the Acquisition Motion because of the Debtor's failure to disclose the multiple and competing roles that its principal has undertaken with at least three different parties to the proposed Settlement Agreement. Finally, the Acquisition Motion must be denied because it seeks to validate an assignment of claims based on allegations of fraud and misrepresentation which, under Massachusetts law, may not be assigned.

In support of this objection, LBM makes the following statements:

**Introduction**

1.   On February 11, 2008, the Debtor commenced an adversary proceeding (No. 08-01030) (the "**Litigation**") against LBM objecting to the validity, priority and existence of the LBM Mortgage (defined below), and asserting ten counterclaims that sought, among other relief,

a judgment against LBM for money damages. LBM filed a motion to dismiss the Litigation to the extent that the Debtor sought relief grounded in the rights of third parties and for failing to state claims upon which relief may be granted.

2. On August 6, 2008, this Court entered a memorandum and order granting LBM's motion to dismiss the Debtor's ten counterclaims. This Court also granted LBM's motion to dismiss the claim objection to the extent the objection was predicated upon relief under Counts I (Declaratory Judgment), II (Breach of Contract), III (Breach of Covenant of Good Faith and Fair Dealing), IV (Unjust Enrichment), V (Fraud), VI (Equitable Subrogation), IX (Equitable Estoppel), and X (Violation of c.93A – Unfair and Deceptive Acts and Practices). The Debtor has appealed the August 6, 2008 decision and the current briefing schedule requires the Debtor to file its brief on or before December 19, 2008.

3. On October 7, 2008, the Debtor filed the Acquisition Motion seeking this Court's authority to "purchase" claims and causes of action held by 14 Beach Street Realty Trust ("**Beach Street**"), Charles J. Housman, Trustee of the Pine Banks Nominee Trust ("**Pine Banks**") and Foundry Realty, LLC ("**Foundry**") (collectively, the "**Assigning Co-parties**"), and Barry Queen (former member of Foundry, which was dissolved on June 1, 2007) ("**Queen**") against LBM, Wolfpen Financial, LLC, Marcello Mallegni ("**Mallegni**"), Michael J. Norris ("**Norris**") and others. One of the Debtor's expressed goals of the Acquisition Motion is to eliminate the need for appeal. The Acquisition Motion seeks to accomplish this goal by acquiring claims from the Assigning Co-parties in exchange for granting certain releases.

A.   <u>**Acquisition of Claims**</u>

4. Through the Acquisition Motion, the Debtor seeks to acquire all claims that Pine Banks, Foundry and Beach Street may have against LBM, Wolfpen, Mallegni, Norris and others;

2

however, the Debtor fails to describe the nature of those claims.

### i.    Pine Banks

5.    To LBM's knowledge, the claims the Debtor seeks to acquire from Pine Banks are fraud-based claims that provide the basis for three separate lawsuits involving three separate parcels of real estate against which Pine Banks was granted mortgages from Foundry and Bernard Laverty ("**Laverty**") to secure loan arrangements by and between Pine Banks, Foundry and Laverty. Each of these lawsuits is grounded in Pine Banks' allegations that LBM engaged in fraud arising from one or more misrepresentations it made to Pine Banks. Each of the lawsuits is in a separate state court in the Commonwealth and at a separate stage of litigation:

> (a)    Pending in Plymouth County Superior Court is Pine Banks' claim to recover approximately $110,000 in surplus funds after the foreclosure by CIT Group of its mortgage on Laverty's Marshfield residence on which Pine Banks had a mortgage junior to that of LBM (the "**Plymouth Action**"). *See* Exhibit A, which is a true and accurate copy of the Answer and Crossclaims of Defendant Charles J. Houseman, Trustee of the Pine Banks Nominee Trust dated August 9, 2007.

> (b)    Pending in Suffolk County Superior Court is Pine Banks' claim for $44,000 in potential damages against LBM arising from LBM's alleged failure to subordinate its mortgage on certain real property located at Unit C-1, Foundry Condominium, 314 West Second Street, South Boston, Massachusetts (the "**Property**") (the "**Suffolk Action**"). *See* Exhibit B, which is a true and accurate copy of the First Amended Complaint and Jury Demand dated April 28, 2008.

> (c)    Pending in Norfolk County Superior Court is Pine Banks' claim to avoid LBM's mortgage on property located at 1736 Liberty Street, Braintree, Massachusetts and enjoin LBM's foreclosure sale. In that case, Pine Banks' request for an injunction was denied and the foreclosure sale occurred on September 16, 2008 (the "**Norfolk Action**"). *See* Exhibit C, which is a true and accurate copy of the Plaintiff's Complaint and Jury Claim dated July 8, 2008.

6.    Currently, the Debtor has no interest in the real estate and other assets at issue in either the Plymouth Action or the Norfolk Action, and no benefit will run to the Debtor's bankruptcy estate (the "**Estate**") from the outcome of those actions.

### ii.    Foundry

7.    The Debtor makes no attempt to describe the claims Foundry might have against LBM. Foundry ceased business as a result of Pine Bank's foreclosure of its mortgage on the Property and was dissolved as a Delaware corporation on June 1, 2007. *See* Exhibit D, which is a true and accurate copy of the Certificate of Dissolution. Although Stuart Sojcher, Esq., signed the "Settlement Agreement" purportedly on behalf of Foundry, it does not appear that either he or anyone else is authorized to act on its behalf.[1] *See id.*

8.    In addition, the Debtor has agreed not to assert any claims or causes of action against Queen individually in consideration for his execution of the "Settlement Agreement" as a member of Foundry. It is unclear, however, what claims the Debtor could have had against Queen, particularly where no claims against him are listed in the Debtor's schedules and he received a discharge of all debts on January 23, 2008, seven months before the "Settlement Agreement" was signed.

### iii.    Beach Street

9.    Beach Street has never entered into a contract or other business dealing with LBM, Wolfpen, Mallegni, or Norris that might give rise to any claim. As such, it is similarly unclear what claims the Debtor is seeking to acquire from Beach Street that could assist it in its efforts against LBM.

---

[1] Del. Code Ann. Tit. 8, § 279 reads in pertinent part:
When any corporation organized under this chapter shall be dissolved in any manner whatever, the Court of Chancery, on application of any creditor, stockholder or director of the corporation, or any other person who shows good cause therefor, at any time, may either appoint 1 or more of the directors of the corporation to be trustees, or appoint 1 or more persons to be receivers, of and for the corporation, to take charge of the corporation's property, and to collect the debts and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation . . . .

### B.   Conditional Releases

10. In exchange for acquiring these claims, the Debtor agrees to release Pine Banks, Foundry and Beach Street from any claims it may have against them in connection with the LBM Mortgage (defined below) on the Property. While these claims are neither disclosed in the Acquisition Motion nor (with respect to Foundry and Beach Street) listed in the Schedules of Assets and Liabilities (the "**Schedules**") that the Debtor filed in this case, they would presumably arise only if the Debtor's challenge to the LBM Mortgage is unsuccessful (indeed, the claim against Pine Banks is identified by the Debtor in its Schedule B as being contingent). This is true because the releases to be given by the Debtor are only effective if the Debtor succeeds in extinguishing LBM's claims to the Property—an accomplishment that would seemingly eliminate the need for a release because it would also eliminate the basis for any claim that the Debtor might have against Pine Banks, Foundry and Beach Street.

11. Although this might lead this Court to believe that the Debtor is acquiring potentially valuable claims for nothing, the conflicting allegiances of the Debtor's principal, Steven A. Ross ("**Ross**"), call for an independent evaluation of the motives of the Debtor and the potential benefit to the Estate.[2] In this regard, the Motion fails to note the following facts:

- That Ross was counsel to Pine Banks throughout the events and circumstances which led to the Suffolk Action and was recently presented by Pine Banks as its representative under Mass. R. Civ. P. 30(b)(6) to provide testimony concerning the facts underlying the claims and defenses in that case. *See* Exhibit E, which is a true and accurate copy of the Notice of Deposition dated December 27, 2007 and pertinent excerpts from the April 1, 2008 deposition;

- That during the deposition in the Suffolk Action, Ross had his own counsel present suggesting that claims may have been lodged against him personally;

---

[2] Contemporaneously herewith, LBM has filed its *Motion of LBM Financial, LLC to Appoint Chapter 11 Trustee or, in the Alternative, an Examiner.*

5

- That Ross attended Pine Banks' foreclosure sale of its mortgage on the Property not as counsel to Pine Banks, but instead as the Trustee of Beach Street; and

- That Ross is also a beneficiary of Beach Street holding at least 75% of the ownership interest of that entity.

12. The Motion also fails to note that one of the parties to the "Settlement Agreement" is no longer in existence. Foundry was dissolved on June 1, 2007 and, as such, its ability to conduct any corporate activity is seriously in question. *See* Exhibit D. The statements and actions undertaken by Attorneys Queen and Sojcher purportedly on behalf of Foundry appear to have been unauthorized and/or *ultra vires*.

## Background

### A.   LBM Mortgage and Foundry Guaranty

13. In May 2003, LBM advanced $1.2 million to 655 Corporation ("**655 Corp.**"),[3] which executed a promissory note (the "**Note**") to memorialize its obligation to LBM. Foundry was an affiliate of 655 Corp. at the time the Note was executed. To secure satisfaction of the Note, Foundry executed a Guaranty (the "**Foundry Guaranty**") of that debt and also granted LBM a mortgage (the "**LBM Mortgage**") against the Property. Both the Foundry Guaranty and the LBM Mortgage were executed under seal on or about May 9, 2003.

14. The Note matured on September 9, 2003, but the full amount due under the Note remains unpaid. Foundry also failed to honor its obligations under the Foundry Guaranty.

---

[3] As this Court is likely aware, 655 Corp. is the debtor in a Chapter 11 proceeding pending in this district, docket number 06-13020-JNF, and it is not clear that LBM will ultimately receive any distribution or other payment in satisfaction of the amounts due under the Note as a result of the 655 Corp. bankruptcy proceeding. In fact, the Chapter 11 Trustee of 655 Corp. has recently initiated an action against LBM and Cathay Bank seeking relief including recharacterization of claims and injunctive relief, docket number 08-01275.

6

B. **Pine Banks Mortgage**

15. In November 2003, Pine Banks engaged in a loan transaction with Foundry in which Pine Banks claims to have advanced funds to Foundry sufficient to satisfy the debt underlying the first mortgage recorded against the Property held by Faneuil Investors Group Limited Partnership (the "**Pine Banks Mortgage**").

16. In doing so, Pine Banks claims to have intended to obtain a first mortgage position by securing a subordination agreement from LBM. Prior to advancing funds for the benefit of Foundry, Pine Banks allegedly obtained an oral commitment from LBM to subordinate the LBM Mortgage to the Pine Banks Mortgage. LBM never executed a subordination agreement and further claims that it never agreed to execute such an agreement.

17. In early 2005, Foundry defaulted on its loan obligation to Pine Banks and Pine Banks initiated foreclosure proceedings. Ross and his firm were counsel to Pine Banks in connection with the foreclosure proceedings. Ross and Mark Savage (another member of his firm) were present at the foreclosure sale held on July 7, 2005.

18. Ross, in his capacity as Trustee of Beach Street, purchased the Property at the foreclosure sale from Pine Banks with a bid of $760,000.00. Pine Banks executed a document prepared by Ross' firm entitled "Memorandum of Sale—Additional Terms and Conditions—314 West Second Street, Unit C-1, South Boston, MA" dated July 7, 2005 (the "**Memorandum of Sale**"). *See* Exhibit F, which is a true and accurate copy of the Memorandum of Sale. Through the Memorandum of Sale, Pine Banks warranted to Beach Street that the Pine Banks Mortgage was senior in lien position to any other mortgage of record.

19. Ultimately, Pine Banks initiated the Suffolk Action by filing a Verified Complaint signed under oath by Ross. In the Verified Complaint, Ross explained that he acted as counsel to

7

Pine Banks in connection with its dealings with Foundry and LBM. *See* Exhibit G, which is a true and accurate copy of the Verified Complaint (without accompanying exhibits).

20. The principal claim advanced by Pine Banks in the Suffolk Action was that LBM had orally agreed to subordinate the LBM Mortgage to the Pine Banks Mortgage. *See* Exhibit G, ¶ 11. Pine Banks, alleges (through the attestations of Ross) that it relied on that unwritten agreement when it recorded the Pine Banks Mortgage. *See* Exhibit G, ¶ 12. Pine Banks further claims that, despite receiving $760,000.00 from Beach Street (as high bidder through the foreclosure sale), its reliance on the unwritten subordination agreement may result in harm or damages at some point in the future if either Ross or Beach Street ever make a claim against it. *See* Exhibit G, ¶ 21.

C.     **Queen**

21. At the time of the Foundry Guaranty and the LBM Mortgage, Queen appears to have been a member of Foundry. *See* Exhibit H, which is a true and accurate copy of the Foundry Realty LLC Certificate of Members. Upon information and belief, Queen was also a member of Foundry during the time of the Pine Banks Mortgage. It is unclear when he withdrew as a member of Foundry.

22. Queen filed a voluntary Chapter 7 petition *on* July 6, 2006. *See* Exhibit I, which is a true and accurate copy of Queen's voluntary petition. In his Schedules, Queen disclosed that he owned a membership interest in a number of limited liability companies at the time of his bankruptcy filing. *See* Exhibit J which is a true and accurate copy of Queen's Schedules (with all amendments). Queen did not list any interest in Foundry in either his original Schedules or any of the several subsequent amendments thereto. *See id.* Queen did not list any claim against him (disputed or otherwise) by the Debtor or Beach Street and he did not list any claim against

LBM. *See id.*

23.   Queen received his bankruptcy discharge on January 23, 2008. *See* Exhibit K, which is a true and accurate copy of Queen's bankruptcy discharge.

24.   In consideration for Queen's execution of the "Settlement Agreement," the Debtor has agreed not to assert any claims or causes of action against Queen individually or as a member of Foundry. However, it is unclear what claims or causes of action the Debtor could have against Queen individually, particularly because Queen filed his bankruptcy petition before the Debtor came into existence.

### D.   The Debtor's Formation And Bankruptcy Case

25.   Ross, a member of the Debtor and its manager, first executed a Certificate of Organization for the Debtor on July 18, 2007 and filed it with the Secretary of the Commonwealth of Massachusetts the next day. *See* Exhibit L, which is a true and accurate copy of the Certificate of Organization. Ross holds a 75% ownership interest in the Debtor. *See id.*

26.   On July 19, 2008, Ross, as Trustee of Beach Street, executed a Unit Deed transferring the Property to the Debtor for "consideration paid of One Dollar ($1.00)." *See* Exhibit M which is a true and accurate copy of the Unit Deed.

27.   On July 25, 2007, —six days after the Debtor was first incorporated—the Debtor filed a voluntary Chapter 11 petition in an attempt to halt the efforts of LBM to conduct a foreclosure sale of the LBM Mortgage. The Debtor continues to operate as a debtor-in-possession and no creditors' committee has been appointed in this case.

28. The Debtor's petition indicates that it is a single asset real estate entity whose only assets are the Property, the funds generated by the Property,[4] and certain claims related to the Property. Upon information and belief, the market value of the Property is far less—possibly millions of dollars less—than the total amount remaining due under the Note.

29. According to the Debtor's Schedules, the Debtor has only one unsecured creditor, GMCR Capital, LLC ("**GMCR**"). Based on a recent Certificate of Organization on file with the Secretary of State for the Commonwealth of Massachusetts, GMCR is a Massachusetts limited liability company managed by Ross. *See* Exhibit N which is a true and accurate copy of the Certificate of Organization. Upon information and belief, GMCR is an affiliate of the Debtor under 11 U.S.C. § 101(2) and possibly an insider of the Debtor as well under 11 U.S.C. § 101(31). The Schedules indicate that GMCR's claim against the Debtor arose three weeks <u>before</u> the Debtor existed.

30. The Debtor does not list in its Schedules any claim against Foundry, Queen or Beach Street.

### Argument

31. The Acquisition Motion should be denied, because the Debtor has failed to show that the proposed Settlement Agreement is fair, equitable and in the best interests of the Estate and its creditors, based on sound business judgment exercised by independent management, and permissible under Massachusetts law.

---

[4] According to the Debtor's Actual to Budget Reports, as filed with this Court, the Debtor's monthly net income has never exceeded $2,700.00.

### A. The Acquisition Motion Should Be Denied Because There Has Been No Showing That The Proposed Settlement Agreement Is Fair And Equitable And In The Best Interests Of The Estate And Its Creditors

32. The relief sought in the Acquisition Motion is more properly viewed as a motion to approve the settlement of a controversy pursuant to Fed. R. Bankr. P. 9019. In fact, the operative document attached to the Acquisition Motion as Exhibit A is entitled "Settlement Agreement." "By its very nature a settlement resolves adversarial claims prior to their definitive determination by the court. In contrast, a 'sale' effects a 'transfer of ['the title . . .'] [to] property for [a] consideration . . . .'" *In re Healthco Int'l*, 136 F.3d 45, 49 (1st Cir. 1998) (citation omitted).

33. The approval of a compromise or settlement is within the sound discretion of the Bankruptcy Court. In exercising that discretion, the Bankruptcy Court is to "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *In re GHR Co.*, 50 B.R. 925, 931 (Bankr. D. Mass. 1995) (Glennon, J.) (*citing In re Boston and Providence R.R.*, 673 F.2d 11, 12 (1st Cir. 1982)).

34. The First Circuit has identified the following factors that a Bankruptcy Court may consider in determining whether to approve a settlement: "(i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise." *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995) (*citing In re Anolik*, 107 B.R. 426, 429 (D. Mass. 1989)). "Although *Jeffrey* involved a Chapter 7 petition, courts routinely use these same principles in the Chapter 11 context." *Jeremiah v. Richardson*, 148 F.3d 17, 23 (1st Cir. 1998) (citations omitted).

35.    Consideration of the foregoing factors should demonstrate whether the compromise is fair and equitable, and whether the claims the estate is giving up are outweighed by the advantage to the estate of the settlement. *In re C.R. Stone Concrete Contractors, Inc.*, 346 B.R. 32, 49 (Bankr. D. Mass. 2006) (Hillman, J.). The burden of proof is on the party seeking approval of the proposed settlement. *Id.* (*citing In re Adley*, 333 B.R. 587, 608 (Bankr. D. Mass. 2005) (Feeney, J.)). "The duty of the [debtor in possession] in considering whether to settle a claim is '... to reach an informed judgment, after diligent investigation, as to whether it would be prudent to eliminate the inherent risks, delays and expense of prolonged litigation in an uncertain case.'" *Id.* (*citing In re Thompson*, 965 F.2d 1136, 1145 (1st Cir.1992)). In fact, through the proposed transaction, the Debtor is actively seeking to engage the Estate in a risky and likely prolonged litigation.

36.    The Debtor fails to meet its burden and the Acquisition Motion should be denied. The Acquisition Motion provides no information on the claims the Debtor seeks to acquire, which leaves this Court to guess at the nature of the claims and what impact they might have on the Estate and its creditors. In addition, the Debtor has failed to demonstrate what value will come into the Estate as a result of this Court granting the relief requested in the Acquisition Motion. Where LBM has been vigorously contesting the state court claims brought by Pine Banks, the only certainty is that the Debtor will be incurring the expense of prosecuting those fact intensive disputes.

37.    The relief requested in the Acquisition Motion is a transparent attempt by Ross to prosecute his personal agenda at the expense of the Estate. The Debtor fails to disclose the close and insider relationships between and among the Debtor, the Assigning Co-parties, Queen and Ross. Moreover, the proposed transaction is not fair and equitable and is not in the best interests

of the Estate and its creditors, because the attendant litigation will cause the Estate to incur significant additional administrative fees and costs on top of the already mounting legal fees incurred to date (both the Debtor's bankruptcy counsel and its special litigation counsel have been hired on an hourly, non-contingent, basis).

### B. If Characterized As A Sale Subject to 11 U.S.C. § 363(b), The Acquisition Motion Should Be Denied Because There Has Been No Showing That A Sound Business Purpose Justifies Approval Of The Proposed Transaction

38. "Section 363(b) of the Bankruptcy Code provides that a 'trustee [or debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate,' 11 U.S.C. § 363(b), when a sound business purpose justifies such action." *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (Feeney, J.) (citations omitted). "In determining whether to approve the business decision of a debtor-in-possession or a trustee, the 'bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate.'" *Id.* "In addition, a debtor's business decision 'should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" *Id.* (*citing In re Logical Software*, 66 B.R. 683, 686 (Bankr. D. Mass. 1986)).

39. The Acquisition Motion should be denied, as the purchasing of claims is too far removed from the nature of the Debtor's business and this bankruptcy case. The Debtor is a single asset real estate entity—not a vehicle designed for litigation—and it has no previous experience in engaging in litigation that would make it particularly well suited to "buy" these claims and present them before this or any tribunal. Moreover, the Debtor likely has no ability to

fund the litigation, as the Debtor generates no more than $2,700.00 per month in net cash flow.

40. There is no "business" decision being made in relation to the Acquisition Motion. The Debtor is attempting to "buy" certain claims against LBM and others in order to proceed with litigation for which this Court has already ruled that the Debtor has no standing to bring.

41. The interests of the Estate, its creditors and parties in interest are not the priority of the Debtor's management—management that has conflicting interests and has not been completely forthright regarding those interests and the transactions proposed in the Acquisition Motion. Little weight should be given to the representations of Ross given the apparent conflict of interest and the leverage he has with a majority of the parties to the proposed transaction.

42. The Debtor gives no explanation of why the relief sought in the Acquisition Motion is the best interests of the Estate and its creditors. Moreover, the lack of detail and complete disclosure in the Acquisition Motion prevents this Court or parties in interest from analyzing the Debtor's decision and the potential risk to the Estate.

43. Lastly, the Acquisition Motion seeks to inappropriately effectuate a third party release (Pine Banks and Beach Street) for which this Court has no jurisdiction. "[A] bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate." *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2nd Cir. 2008). This release, would however, directly affect and benefit Ross.

### C. The Claims The Debtor Proposes To Acquire From Pine Banks Are Not Assignable Because They Arose Out Of Fraud And A Cause Of Action In Fraud Is Not Assignable Under Massachusetts Law

44. Separate and independent from any of the prior arguments, is the long standing principle in the Commonwealth of Massachusetts that a cause of action in fraud cannot be assigned. *Nat'l Shawmut Bank of Boston v. Johnson*, 58 N.E.2d 849, 851 (1945).

45.     The fraud in *Nat'l Shawmut* was perpetrated by the defendant forging his wife's signature on notes and mortgages to obtain a loan from the plaintiff bank. The bank received an insurance payment under a forgery policy, characterized as a loan repayable only to the extent that plaintiff recovered payment from defendant. It issued a receipt for this loan to the insurance company while concurrently agreeing to prosecute, at the insurance company's expense and direction, claims against the defendant and pledging any recovery to the insurance company. The defendant argued that the receipt from plaintiff to the insurance company was a prohibited assignment of the cause of action. The Supreme Judicial Court deemed it not to be an assignment, but in so deciding noted:

> It is doubtless the law of this Commonwealth that a right to litigate a fraud perpetrated upon a person is not assignable at law or in equity, and that the prosecution by the alleged assignee of an action or suit on account of the fraud would be contrary to public policy.

*Id.* at 851 (citations omitted).

46.     *Nat'l Shawmut* was cited by the Supreme Judicial Court in the later case of *Barrett v. Hamel*, 148 N.E.2d 364, 368 (1958):

> The defendants rely upon our cases which hold that a right of action for fraud is not assignable and that it would be against public policy to permit an assignee to litigate a fraud practised upon his assignor . . . [s]uch cases dispose of much of the proposed amended bill . . . .

*Id.* (citing *United Zinc Cos. v. Harwood*, 103 N.E. 1037 (1914); *Mulready v. Pheeny*, 148 N.E. 132 (1925); and *Nat'l Shawmut*).

47.     Because the claims that the Debtor seeks to acquire from Pine Banks are based on allegations of fraud and misrepresentation, they cannot be assigned under Massachusetts law.

15

## Conclusion

48. The Acquisition Motion must be denied based the Debtor's failure to establish that the Settlement Agreement is in the best interests of the Estate and its creditors or permissible under Massachusetts law. The proposed transaction raises more questions than it answers and exhibits the leverage that Ross maintains over the Debtor and the Assigning Co-parties, as well as his failure to comply with the fiduciary duties owned to the Estate and its creditors.

WHEREFORE, LBM prays that this Court enter an order (a) denying the relief requested in the Acquisition Motion, and (b) granting such other and further relief as may be just and proper.

Respectfully submitted,

LBM FINANCIAL, LLC,

Dated: October 31, 2008

*/s/ Jeffrey D. Ganz*
Jeffrey D. Ganz (BBO #564375)
Kristin M. McDonough (BBO #637899)
Riemer & Braunstein LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 523-9000